IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs at Knoxville December 17, 2019

**JOSEPH A. COLWELL, SR. v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Maury County**
**No. 2014-CR-23608      Russell Parkes, Judge**

_____

**No. M2019-00212-CCA-R3-PC**
_____

The Petitioner, Joseph A. Colwell, Sr., appeals the Maury County Circuit Court's denial of his petition for post-conviction relief, seeking relief from his two convictions of rape and two convictions of incest and resulting effective twenty-year sentence. On appeal, the Petitioner contends that he received the ineffective assistance of counsel because trial counsel failed to object to evidence of prior sexual abuse pursuant to Tennessee Rule of Evidence 404(b), failed to file a motion to question one of the victims about her prior sexual behavior pursuant to Tennessee Rule of Evidence 412, and failed to present evidence from electronic devices that would have been helpful to his case. Based upon the record and the parties' briefs, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ALAN E. GLENN, JJ., joined.

Brandon E. White (on appeal), Columbia, Tennessee, and Jonathon W. Davis (at hearing), Pulaski, Tennessee, for the appellant, Joseph A. Colwell, Sr.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; Brent A. Cooper, District Attorney General; and Kyle Dodd, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

In August 2014, the Maury County Grand Jury indicted the Petitioner for one count of rape, one count of incest, and one count of sexual battery by an authority figure committed against his daughter, D.C., and one count of rape, one count of incest, and one

count of sexual battery by an authority figure committed against his son, J.C. The indictment alleged that the offenses occurred on or about June 13, 2014.

The State dismissed the two counts of sexual battery by an authority figure. The Petitioner went to trial in June 2015, and the jury convicted him of two counts of rape and two counts of incest as charged in the indictment. On direct appeal of his convictions, this court gave the following account of the proof presented at trial:

Detective Carl Shrake of the Columbia Police Department responded to a report regarding a rape. When he arrived at the mobile home, he met D.C. and J.C., Defendant's children. Their grandmother was also present at the time. According to D.C., Defendant raped her the night prior to Detective Shrake's visit and had done so on multiple occasions in the past. Detective Shrake noted that the child was visibly upset. J.C. confirmed that Defendant "made him do things" he did not want to do. Detective Shrake sent the children to Nashville to undergo rape evaluations.

At trial, D.C. was almost sixteen years of age. She testified that after enduring ongoing abuse, she finally told a family friend, Shelley Ladd, that Defendant "was raping [her] . . . and her brother." The victim explained that she was "forced" to have sex with her father multiple times even though she "would cry and tell [Defendant] not to [do it]." Defendant would tell D.C. to go into his bedroom. Once in the room, Defendant "would start taking off his clothes." He told D.C. to take off her clothes. When she did not comply, Defendant would take off her clothes. D.C. "always asked him why he did it to me . . . and he would tell me it was because we either scared his girlfriends away or we acted up. . . ." D.C. was "very afraid because it hurt." On the night before she reported the abuse, Defendant put a pillow "underneath her butt" before putting his penis in her vagina. She explained that Defendant "didn't use [a condom]" because "he got fixed so he wouldn't get anybody pregnant." The victim described that, at times, Defendant had her lie on her back and other times she was on her knees. She described Defendant as "rough," and he "would like make noises" or say, "That booty's mine," during the rapes. Defendant often ejaculated on the victim's stomach and "would be like touching her everywhere" when he finished. Defendant told the victim to go clean up and the victim would "use a piece of toilet paper to wipe it off my stomach or anywhere he got it and then I would take a shower."

D.C. was aware that her brother was also being raped. She discussed the abuse with her brother "a lot." D.C. threatened to tell someone about the abuse on more than one occasion, but she explained that she and J.C. were afraid to tell anyone because Defendant would "threaten [them], scare

- 2 -

[them]." The victim described being "scared to death" because Defendant had "choke[d her] or jam [med] his finger in [her] or he would talk about how [the victims] would never get to see each other again [because they would end up in foster care]."

J.C., who was fourteen at the time of trial, recalled that two days prior to telling someone about the abuse, Defendant raped him in the living room of their home. J.C. was watching television on the love seat when Defendant came into the room holding "torn-off pieces" of toilet paper in his hand. Defendant said, "Come on, son." J.C. knew what Defendant wanted because Defendant had done this before. J.C. was "afraid." Defendant made J.C. pull down Defendant's pants and boxers. J.C. was on his knees and Defendant made him "suck his thing" with his mouth. Defendant was lying on the couch with his hands on the back of J.C.'s head "pushing [his] head up and down." J.C. testified that he was "angry" at Defendant for "making [him] do it." When Defendant "finished," he "put his sperm in the toilet paper." J.C. never told his father that he did not want to do it because he "didn't want to hurt his feelings."

D.C. admitted that she and her brother had friends over to the house without their father's permission several times during the summer before they reported the abuse. On at least one of these occasions, the basement door was kicked in and someone caused damage to the door of her bedroom. There were also a few "holes" in the walls. D.C. acknowledged that Defendant put in a webcam to monitor activity in the house while he was at work. According to D.C., "someone" unplugged the webcam. J.C. testified that he and D.C. unplugged the webcam.

On the day they actually reported the abuse, D.C. and J.C. invited friends over to the house without their father's permission. Defendant's sister, Tammy Colwell, came to the house to check on things, presumably after Defendant realized that the webcam was unplugged. Tammy made D.C. and J.C. go to their grandmother's house and threatened to call the police on the visitors. D.C. testified at trial that getting caught with friends at the house had nothing to do with her disclosure of the rapes. Shelley Ladd, the person to whom the rapes were first disclosed, testified at trial that she was talking to D.C. on the day the children were caught with friends at the house. D.C. was upset about getting in trouble and was afraid that her father would beat her. Ms. Ladd explained that D.C. "broke down" and proceeded to tell her about the rapes. Ms. Ladd then spoke with J.C. before finding a police officer.

Detective Shrake spoke with Defendant about the allegations, describing Defendant's attitude as "blasé." Defendant denied the allegations and informed Detective Shrake that items were missing from his home because his children had other teenagers over to the house while he was at work. Defendant admitted that he had a vasectomy.

Based on the statements from D.C. and J.C., Detective Shrake obtained a search warrant for the residence. Officers removed computers, bed sheets, and couch cushion covers. Additionally, officers obtained the clothing worn by the children. The Tennessee Bureau of Investigation ("TBI") received the items. The search did not result in the discovery of any pornographic material of children on the computers. Additionally, there was no semen found on the victims' clothing.

Defendant did not testify at trial. Briana Colwell, the victims' cousin, testified that D.C. had previously accused Defendant of rape. Ms. Colwell claimed that she visited D.C. one time when she had friends over without permission and that D.C. told her if she got caught she would "lie on her dad" by saying that he raped her.

State v. Joseph A. Colwell, Sr., No. M2016-00130-CCA-R3-CD, 2016 WL 5416337, at *1-2 (Tenn. Crim. App. at Nashville, Sept. 28, 2016), perm. app. denied, (Tenn. Jan. 19, 2017).

The trial court sentenced the Petitioner to ten years for each rape conviction, a Class B felony, and four years for each incest conviction, a Class C felony. The trial court ordered that the Petitioner serve the ten- and four-year sentences for each victim concurrently but that he serve the effective ten-year sentence for each victim consecutively for a total effective sentence of twenty years.[1]

On direct appeal of the Petitioner's convictions, he argued that the evidence was insufficient to support the convictions and that his effective twenty-year sentence was excessive. See id. at *2. This court affirmed the Petitioner's convictions and sentence. Id. at *5. In finding the evidence sufficient, this court noted that the victims "described in graphic detail exactly how Defendant committed the offenses." Id. at *3. This court then stated as follows:

[T]he jury heard and discredited Defendant's theory that the children made up the allegations to avoid getting in trouble for having friends over to the house while Defendant was at work. D.C. acknowledged that she had

---

[1] The Petitioner was statutorily required to serve the ten-year sentences for rape at one hundred percent. See Tenn. Code Ann. § 40-35-501(i)(1), (2)(G).

friends over without her father's permission and that items at the house were damaged, but she testified that this had absolutely nothing to do with the report of the abuse. J.C. agreed, testifying that he would never lie about rape to avoid a "whipping." The jury assessed the credibility of the witnesses, clearly accrediting the testimony of D.C. and J.C.

Id. at *4.

After our supreme court denied the Petitioner's application for permission to appeal, he filed a timely pro se petition for post-conviction relief, claiming that he received the ineffective assistance of trial and appellate counsel. The post-conviction court appointed counsel, and counsel filed an amended petition, raising the following issues that are the subject of this appeal: (1) that trial counsel was ineffective for failing to object to numerous statements made during trial about prior instances of rape by the Petitioner pursuant to Tennessee Rule of Evidence 404(b); (2) that trial counsel was ineffective for failing to file a motion to present evidence of D.C.'s past sexual behavior pursuant to Tennessee Rule of Evidence 412; and (3) that trial counsel was ineffective for failing to ask the State for surveillance video from inside the Petitioner's home, which would have shown that D.C. lied about the abuse "right after she got caught with boys over at her house," and for failing to have an expert determine whether the Petitioner deleted inappropriate photographs of D.C. from his electronic devices.

At the evidentiary hearing, trial counsel testified for the Petitioner that he began practicing law in 2011 and did "a lot of criminal defense work." Initially, the Petitioner's family hired an attorney to represent the Petitioner, and the attorney represented the Petitioner at the preliminary hearing. However, the attorney went to work for the district attorney's office, so he asked that trial counsel take over his law practice. Trial counsel reviewed the attorney's files and took over the attorney's cases, including the Petitioner's case, "lock, stock, and barrel." Trial counsel spoke with the Petitioner and the Petitioner's family, and the Petitioner agreed for trial counsel to represent him.

Trial counsel testified that the Petitioner was in jail and that he met with the Petitioner multiple times. Trial counsel also discussed the case "in depth" with the Petitioner's mother because she was "heavily involved" in the case and "had some knowledge of the accusations." Trial counsel said that he spoke with "a friend of the family," who had talked with the victims about the crimes; that he reviewed all discovery materials, including the police report; and that he spoke with Detective Shrake, who was "very open" with trial counsel. Trial counsel said that he had a "good feel" for the State's proof and that he was not surprised by Detective Shrake's trial testimony because Detective Shrake testified consistently with the police report.

Trial counsel testified that the State did not have a lot of evidence against the Petitioner. For example, the victims had been physically examined and evidence had

been collected for rape kits, but the State did not obtain any helpful evidence from the kits. The State also did not obtain any inculpatory evidence from searching the Petitioner's electronic devices. Trial counsel watched recordings of D.C.'s forensic interview and the Petitioner's police interview. Trial counsel said that he thought the Petitioner "did a fairly good job" in his interview with Detective Shrake but that "[t]here were a few things that [trial counsel] wasn't exactly sure how [they] were gonna handle at trial."

Trial counsel testified that the Petitioner "adamantly denied" abusing the victims and wanted to tell the jury his side of the story. Because there was no physical proof against the Petitioner, trial counsel thought the Petitioner needed to testify in order to rebut the victims' claims. Trial counsel explained, "[O]ur plan was that he would testify. We felt like that was probably his only chance. . . . [A]nd if Mr. Colwell did not testify to rebut what the children said then the jury is left with their testimony." Trial counsel said he spent a "significant amount" of time preparing the Petitioner for direct examination and cross-examination. After the State closed its proof, though, the Petitioner became "very nervous," and trial counsel began to worry that the Petitioner "wasn't gonna be able to do a very good job testifying." Trial counsel said he left the decision up to the Petitioner and explained as follows:

> But [the Petitioner], after seeing General Dodd make arguments to the Court and question witnesses, he was very concerned for whatever reason about General Dodd cross-examining. And so that is what primarily, I think, led to his decision to not testify and the fact that he just became nervous about it.

Trial counsel stated that, in hindsight, the Petitioner's decision not to testify was "very damaging" to the Petitioner's defense.

Trial counsel testified that a prior investigation had involved similar accusations against the Petitioner by a different victim and that trial counsel filed a pretrial motion to exclude evidence of prior bad acts. Trial counsel said that he was familiar with Tennessee Rule of Evidence 412 and that he and the Petitioner talked about "the fact that [D.C.] may have been sexually involved with other boys." Trial counsel tried to cross-examine D.C. about her prior sexual activity, but he was not allowed to do so because he had not filed a Rule 412 motion. Trial counsel said that he did not know why he did not file the motion but that "I don't know ultimately how much difference it would have made . . . if she admitted [she] had sex with so-and-so beforehand." Trial counsel acknowledged that he should have filed the motion.

Trial counsel testified that the Petitioner claimed that other teenage children would "come and go" from his house and that the teenagers would "tear things up" and "steal things." On one occasion, the police were called, and Officer Nicholas Moss conducted a

burglary investigation. Trial counsel did not try to talk with the victims before trial because he did not think they would speak with him. However, they had testified at the Petitioner's preliminary hearing, and trial counsel thought he listened to a recording of their testimony. Trial counsel acknowledged that the victims testified at trial that "it had happened before" and that he did not object to their testimony. Trial counsel said that their statements about prior sexual abuse were brief but that the post-conviction court would have to decide whether their statements made a difference at trial.

Trial counsel acknowledged that D.C. claimed the Petitioner took inappropriate photographs of her, stored the photographs on electronic devices, and deleted the photographs. The police searched the Petitioner's home and removed electronic devices, such as a computer, from the residence. The TBI searched the devices but did not find any photographs. Trial counsel did not have the devices independently examined to determine if the Petitioner had deleted any photographs. Trial counsel said he thought the Petitioner was telling the truth about not abusing the victims; however, if the Petitioner was not telling the truth, trial counsel did not want to hire an expert to find deleted images.

Trial counsel acknowledged that the Petitioner said he set up a surveillance camera in his living room because the victims were having parties and damaging his house. The Petitioner was able to "live stream" the camera, but the camera was often "unplugged." Trial counsel said that he did not remember the Petitioner's asking him to obtain surveillance video or the Petitioner's telling him that the video would contain helpful evidence.

On cross-examination, trial counsel acknowledged that the Petitioner did not confess to the crimes; therefore, this case came down to witness credibility. Trial counsel did not speak with D.C. before trial and did not have proof of her prior sexual behavior. The Petitioner told trial counsel, though, that "there were lots of boys coming and going" and that the Petitioner "had reason to believe that [D.C.] had had sex with one of the boys." Trial counsel acknowledged that one of the purposes of Tennessee Rule of Evidence 412 was to present evidence of prior sexual behavior in order to rebut evidence about a victim's sexual history or a victim's knowledge about sex. However, the State did not present any evidence about D.C.'s sexual history and did not suggest that she gained her sexual knowledge from the Petitioner. Trial counsel acknowledged that it would not be surprising for a fifteen-year-old to have knowledge about sex even if the teenager was not sexually active. Nevertheless, trial counsel thought that evidence about D.C's prior sexual activity "could have been offered to show that she had knowledge that would explain . . . her ability to testify as detailed as she did." Trial counsel said that D.C. "came across" as a very credible witness and that based on his observations of her at trial, the jury found her credible. Trial counsel said that the jury "could have looked unfavorably on a 15-year-old girl if she had been promiscuous" but that he thought the jury would have found D.C. credible even if the defense had been able to present

evidence about her sexual history. Trial counsel acknowledged that evidence about D.C.'s sexual history would not have impacted J.C.'s testimony.

Trial counsel testified that he could have objected to the victims' testimony that "it happened before" but that neither victim testified in detail about any prior instances of sexual conduct with the Petitioner. Trial counsel said that objecting to the statements could have done "more harm than good by drawing a lot of attention to it." The State asked trial counsel, "So not objecting that could have been a strategic decision?" Trial counsel answered, "Could have been."

Trial counsel acknowledged that D.C. testified at trial that she often would unplug the surveillance camera. Trial counsel acknowledged that if the camera was unplugged, it would not record. Trial counsel also acknowledged that the State never disclosed any video evidence to him and that he did not know if any video evidence existed. Trial counsel said he thought he provided competent and effective representation to the Petitioner.

Officer Nicholas Moss of the Columbia Police Department testified that in June 2014, he responded to a burglary call at the Petitioner's home. The Petitioner made the call, and he and the victims were present at the residence. The Petitioner reported to Officer Moss that a Nintendo game system, a PlayStation video game, a handgun, a fireproof safe, and two checkbooks were missing. Officer Moss did not find any evidence of a burglary such as kicked-in doors or broken windows, but J.C. told Officer Moss that he usually slept with his window open and that he had forgotten to close it. The victims told Officer Moss that they did not know who took the missing property, and the burglary was never solved.

The Petitioner testified that he "put all [his] confidence" in trial counsel. He said that trial counsel "performed to the best of his ability at the time" but that "some points could have been made that possibly [would have] made it a better trial." The Petitioner said that he understood "a little" about prior bad acts and acknowledged that the victims testified about prior instances of sexual conduct with him. The Petitioner said he thought their improper testimony "kind of persuaded the jury a little more."

The Petitioner testified that he set up "a type of web cam" in his living room, that the camera "went through [his] phone," and that he could see the victims with the camera but that they could not see him. A motion sensor on the camera would "trigger" anytime someone entered or exited the living room, and the camera would record "three minutes at a time." The video was stored on the Petitioner's cellular telephone. The Petitioner said the video would have shown the jury that D.C. was being "mischievous" and that her friends were being destructive, which "probably would have showed a lot in favor of [his] defense."

The Petitioner testified that he told trial counsel that he had "a feelin'" D.C. was sexually active. The Petitioner explained that just before the victims made the allegations against him, he let D.C. know that he was aware of her sexual behavior. He said that D.C. "did not deny [it] at all." The Petitioner could have testified about her sexual behavior at a pretrial hearing, but trial counsel did not file a motion pursuant to Tennessee Rule of Evidence 412. The Petitioner said that D.C. was "prone to lyin'" and that her cousin, Brianna Colwell, testified at trial that D.C. claimed she was going to lie about the Petitioner's raping her. The Petitioner said that the victims "did not like getting punished" and that he thought they "[did] what they had to do to stay out of trouble."

The Petitioner testified that J.C. said at trial that D.C.'s friend had taken property from their home. When Officer Moss spoke with J.C. in June 2014, though, J.C. claimed he did not know who took the property. The Petitioner wanted Officer Moss to testify at trial so that trial counsel could attack J.C.'s credibility. Moreover, trial counsel should have obtained Officer Moss' police report regarding the burglary so that trial counsel would have known J.C.'s trial testimony was inconsistent with what J.C. told Officer Moss.

The Petitioner testified that he planned to testify at trial and that he and trial counsel "worked hard" on his proposed testimony. However, the Petitioner's "nerves got overwhelmed," and he began "second-guessing" whether he should testify. He said that the prosecutor "seemed like . . . a drooling bulldog" and that the prosecutor was "attacking to win his side of the case." The Petitioner said he "didn't want to be, as you would say, a deer put in the headlights," so he decided not to testify. He thought trial counsel should have had "a backup strategy" in case he decided not to testify.

On cross-examination, the Petitioner testified that his friend, Shelly Ladd; that his sister, Tammy Colwell; and that his niece, Brianna Colwell, testified for him at trial and that some of their testimony helped his defense. Moreover, Detective Shrake testified that there was no physical evidence against the Petitioner. The Petitioner acknowledged that he and trial counsel "prepared extensively" for his trial testimony and that he decided not to testify "at pretty much the last minute." He also acknowledged that he regretted not testifying and that he had "[n]othing to lose" by doing so.

In a written order, the post-conviction court denied the petition for post-conviction relief. Regarding trial counsel's failure to file a motion pursuant to Tennessee Rule of Evidence 412, which prevented him from asking D.C. at trial about her past sexual behavior, the post-conviction court found that the Petitioner was not entitled to relief because he failed to present any proof at the evidentiary hearing as to what D.C. would have said at trial about her prior sexual activity.

Next, the post-conviction court addressed trial counsel's failure to object to numerous portions of the trial testimony in which witnesses said the sexual abuse had

occurred previously. The post-conviction court noted that the Petitioner was relying on State v. Woodcock, 922 S.W.2d 904 (Tenn. Crim. App. 1995), to argue that he was entitled to relief. However, the post-conviction court found the instant case "startlingly different" from Woodcock in that "of the one hundred two (102) pages of direct examination of the victim [in Woodcock,] some forty-two (42) pages involved testimony concerning uncharged sexual misconduct." In the Petitioner's case, though, the victims "did not get into specifics of prior bad acts," and their references to prior bad acts were "inconsequential and inadvertent." The post-conviction court then noted that trial counsel filed a pretrial motion pursuant to Tennessee Rule of Evidence 404(b) to prevent the State from introducing evidence about other bad acts. The post-conviction court further noted that during a hearing on the motion, the State advised the trial court that trial counsel and the State had come to "an agreement" that the State would "'not get into anything other than, is this the first time it's happened.'" The post-conviction court concluded that trial counsel's performance was not deficient but that "[t]o the extent any reviewing Court finds that counsel's 'agreement' and addressing of 404(b) issues was in any way deficient, the Court finds that there has not been a showing of a reasonable probability that, but for counsel's error, the result of the proceeding would have been different."

Finally, the post-conviction court addressed the Petitioner's claims that trial counsel was ineffective for failing to obtain the video surveillance of his living room and for failing to hire an expert to determine whether he deleted inappropriate photographs of D.C. from his electronic devices. Regarding the surveillance video, the post-conviction court found that the Petitioner was not entitled to relief because it was never disputed that D.C. had boys in the home on the day of the alleged offenses. Regarding the electronic devices, the post-conviction court accredited trial counsel's testimony that the State did not find any evidence on the devices that was helpful to the State's case and concluded that the Petitioner failed to show the devices contained exculpatory evidence. Accordingly, the post-conviction court found that the Petitioner was not entitled to relief.

## II. Analysis

The Petitioner contends that he received the ineffective assistance of counsel at trial. The State argues that the post-conviction court properly denied the petition for post-conviction relief. We agree with the State.

To be successful in a claim for post-conviction relief, a petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded

their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Further,

> [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

A. Tennessee Rule of Evidence 404(b)

First, the Petitioner contends that he received the ineffective assistance of counsel because trial counsel failed to object to evidence prohibited by Tennessee Rule of Evidence 404(b). Specifically, the Petitioner contends that trial counsel was deficient for failing to object to testimony about prior sexual abuse and that he was prejudiced by the deficiency because the outcome of his trial would have been different if the jury had not heard the prejudicial testimony. The State argues that trial counsel was not deficient because he filed a motion in limine pursuant to Tennessee Rule of Evidence 404(b) and because trial counsel agreed that the prosecutor would only ask the witnesses, "Is this the first time that it's happened?" The State also argues that even if trial counsel was

deficient, the post-conviction court correctly determined that the Petitioner failed to demonstrate prejudice.

Tennessee Rule of Evidence 404(b) provides, "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes." The conditions which must be satisfied before allowing such evidence are:

> (1) The court upon request must hold a hearing outside the jury's presence;

> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b); see also State v. Thacker, 164 S.W.3d 208, 240 (Tenn.2005); State v. Parton, 694 S.W.2d 299, 302 (Tenn. 1985). Generally, "[o]nly in an exceptional case will another crime, wrong, or bad act be relevant to an issue other than the accused's character. Such exceptional cases include identity, intent, motive, opportunity, or rebuttal of mistake or accident." State v. Luellen, 867 S.W.2d 736, 740 (Tenn. Crim. App. 1992).

As noted by the Petitioner, the State indicted him for only one count of rape and one count of incest as to D.C. and only one count of rape and one count of incest as to J.C. Furthermore, the indictment alleged that all of the offenses occurred on June 13, 2014. On the morning of trial, the following colloquy occurred:

> [The prosecutor]: Judge, we – [trial counsel] and I have discussed the 404 issue. I think we've got an agreement on that we want to put on the record at any time.

> THE COURT: That's great. We can go ahead and do that now, if you want.

> Again, this morning [trial counsel] had filed a 404(b) Motion in Limine. The motion specifically speaks to another indictment that the defendant presently has pending against him. [The prosecutor] agreed that

that would be precluded under 404(b) and that he would not attempt to elicit any -- or argue the prior pending indictment.

[The prosecutor] also indicated to me that he anticipated asking the alleged victims in this case, Was this the first time that your father had done this? Or words to that effect. That was not covered under 404(b), the Motion in Limine specifically. I advised [trial counsel] that if there was going to be a 404(b) objection to that I was aware that I had to have a hearing outside of the presence of the jury, at which time I had to go through all of the steps, including finding by clear and convincing proof that those prior acts had occurred.

[Trial counsel] was, at that point, not exactly sure if he wanted to voice an objection to that particular testimony or how deep it would get. [The prosecutor] indicated that he would not get any deeper with the testimony other than the simple question of, Is this the first time?

So I understand now there is an agreement on that particular line of questioning; am I correct?

[Trial counsel]: I think there is, Judge.

THE COURT: Okay.

[The prosecutor]: And I think that agreement is what we discussed earlier. I intend to ask the victims whether this was the only or the first [time] or some words to that effect. I expect their answer to be, no, this was not the only time. But that's going to be the extent of discussions about prior instances. I'm going to be focusing on only the instances alleged in the indictment.

THE COURT: Okay. And, [trial counsel], your response?

[Trial counsel]: That's our agreement, Judge, that [the prosecutor] certainly can ask if it's the first time. And I may even, depending [on] the testimony on cross-examination, ask how long, but I'm certainly not going to get into any details. But as far as asking was it the first time and how long it had been happening, we have an agreement that those questions will be fine as long as no details are gone into about dates or specific acts or what was done at that point in time.

The State's first witness was Detective Shrake, who testified on direct examination that "[D.C.] had stated that her father had raped her the night before, and that it had – that

- 13 -

was not the first time, that it happened before." During D.C.'s direct testimony, the prosecutor asked, "Did it only happen the one time?" D.C. answered that "[i]t happened a lot," and the prosecutor responded that he was only going to ask her about "the last time." The prosecutor asked D.C. to tell him what happened, and D.C. responded, "He would either lay on top of me or have me on my knees. . . . And sometimes he would lay flat on me and he would, you know – he would be rough with me." The prosecutor stated, "Okay. Now, again, you know, I'm just going to ask about the last time. That's the only thing that I want any specifics about. Is the position that you described for us, is that the way that you were on this last time?" D.C. answered yes, and the prosecutor asked if the Petitioner said anything to D.C. "during the act." D.C. answered, "Most of the time he didn't say anything, but if he did he would make noises or he would say, That booty's mine. He said that once or twice. . . .The last time I don't think he said that, but I know he was making noises." D.C. said that "[s]ometimes" the Petitioner would go into the bathroom with her to clean up. She said that she knew "something was happening" with J.C. as well and that she and J.C. talked about the abuse "a lot." D.C. stated that the Petitioner threatened her if she told anyone about the abuse and that "[h]e didn't threaten us with any weapons or anything. But like if he was raping me he would choke me or jam his finger in me or he would talk about how we would never get to see each other again."

During J.C.'s direct testimony, the prosecutor asked if "it happened before," and J.C. said yes. At the conclusion of J.C.'s testimony, the prosecutor asked, "And . . . the last incident that we've been talking about today, the one incident that we've been talking about here, did that occur here in Columbia?" J.C. again answered yes.

The post-conviction court found that the Petitioner was not entitled to relief, noting that trial counsel filed a pretrial motion to exclude evidence of other bad acts pursuant to Tennessee Rule of Evidence 404(b). The post-conviction court found that trial counsel's subsequently entering into the agreement with the prosecutor, so that the prosecutor could ask the witnesses if the sexual abuse alleged in the indictment was "the first time," was not deficient performance. We agree with the post-conviction court. At the evidentiary hearing, trial counsel testified that he could not remember why he did not object to the victims' testimony but acknowledged that his decision may have been strategic. The Petitioner did not ask trial counsel why he entered into the agreement with the prosecutor. At trial, though, trial counsel advised the trial court, "And I may even, depending [on] the testimony on cross-examination, ask how long [it had been happening], but I'm certainly not going to get into any details." We think trial counsel's statement confirms that his decision to enter into the agreement and not object to testimony about prior instances of abuse was strategic. We note that when trial counsel entered into the agreement, he fully anticipated that the Petitioner was going to testify to rebut the victims' claims. Our review of the trial transcript reveals that during trial counsel's opening statement, he repeatedly told the jury that the Petitioner was going to testify in order to explain why the victims were making up the allegations against him.

However, after the State presented its proof, the Petitioner became nervous and decided not to testify. At the evidentiary hearing, trial counsel said that he thought the Petitioner's testifying to rebut the victims' claims probably was the Petitioner's "only chance" and that the Petitioner's decision not to testify was "very damaging." The Petitioner even acknowledged at the evidentiary hearing that he regretted not testifying and that he had nothing to lose by doing so.

"The fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Moreover, "an accused is not deprived of the effective assistance of counsel because a different procedure or strategy might have produced a different result." Vermilye v. State, 754 S.W.2d 82, 85 (Tenn. Crim. App. 1987). This was a "he said, she said" case in which the defense's theory was that the victims were not credible. The State did not have any physical proof against the Petitioner, and the defense presented significant evidence that the victims had a motive to lie about the sexual abuse in order to keep the Petitioner from punishing them. Defense counsel's entire strategy was based on the Petitioner's proposed testimony, which would rebut the victims' testimony and show they were not credible. Therefore, we conclude that the Petitioner has failed to demonstrate trial counsel was deficient for entering into the agreement with the prosecutor and for not objecting to testimony about prior instances of abuse and that he has failed to demonstrate he was prejudiced by any deficiency.

B. Tennessee Rule of Evidence 412

The Petitioner contends that trial counsel was deficient for failing to file a motion pursuant to Tennessee Rule of Evidence 412 so that he could question D.C. about her prior sexual involvement with boys. He asserts that he was prejudiced by the deficiency because the evidence would have shown that D.C. obtained her knowledge about sexual matters from the boys, not the Petitioner. The State argues that the post-conviction court properly determined that the Petitioner was not entitled to relief on this issue. We agree with the State.

At trial, trial counsel asked D.C. if she had been sexually active "with at least one other person." The State objected, and the trial court found that trial counsel could not pursue the issue because he did not file a motion pursuant to Rule 412, Tennessee Rules of Evidence. The post-conviction court found that the Petitioner was not entitled to relief because he failed to present any proof at the post-conviction hearing of what D.C. would have said about her prior sexual behavior at trial.

Tennessee Rule of Evidence 412 addresses whether evidence of a victim's prior sexual behavior is admissible and the procedure to determine when such information should be allowed into evidence. Usually, evidence of specific instances of a victim's sexual behavior is inadmissible. Relevant to this case, though, a defendant may introduce

evidence of a victim's sexual behavior with persons other than the accused "to prove or explain . . . knowledge of sexual matters[.]" Tenn. R. Evid. 412(c)(4)(ii). However, the victim's knowledge of sexual matters must be relevant to an issue in the case. State v. Douglass Leon Lyle, No. E2012-00468-CCA-R3-CD, 2013 WL 1281857, at *14 (Tenn. Crim. App. at Knoxville, Mar. 28, 2013) (citing Tenn. R. Evid. 402). As this court has noted,

> This provision
>
>> will most frequently be used in cases where the victim is a young child who testifies in detail about sexual activity. To disprove any suggestion that the child acquired the detailed information about sexual matters from the encounter with the accused, the defense may want to prove that the child learned the terminology as the result of sexual activity with third parties.

Id. at *13-14 (quoting Tenn. R. Evid. 412, Advisory Comm'n Cmts).

In order for evidence to be admissible under Rule 412, the accused generally must file no later than ten days prior to trial a written motion seeking to offer such evidence, and the "motion shall be accompanied by a written offer of proof, describing the specific evidence and the purpose for introducing it." Tenn. R. Evid. 412(d)(1)(i). The trial court must hold a jury-out hearing to determine whether the evidence described in the motion is admissible. Tenn. R. Evid. 412(d)(2). The trial court also must determine that the probative value of the evidence outweighs its unfair prejudice to the victim. See Tenn. R. Evid. 412(d)(4).

In this case, D.C. was fifteen years old at the time of the abuse and sixteen at the time of trial, so she was not a young child. Trial counsel even acknowledged that it would not be unusual for a fifteen-year-old to have knowledge about sexual matters and that the jury's hearing D.C. was promiscuous could have prejudiced the jury against her. In any event, the only evidence about D.C.'s prior sexual behavior came from the Petitioner's testimony that he had "a feelin'" D.C. was sexually active, that he let D.C. know he was aware of her sexual behavior, and that she "did not deny [it]." Therefore, we conclude that trial counsel was not deficient for failing to file a Rule 412 motion and that the Petitioner has failed to demonstrate he was prejudiced by trial counsel's failure to file the motion.

## C. Electronic Devices

Finally, the Petitioner contends that trial counsel was ineffective because he failed to obtain surveillance video from the Petitioner's living room or hire an expert to

examine electronic devices seized from the Petitioner's residence. The Petitioner asserts that trial counsel's failure to obtain the video "resulted in the jury never viewing D.C.'s and J.C.'s mischievous behavior, never viewing their friends' mischievous behavior, and never getting to view the full scope of why D.C. and J.C. would fabricate allegations about [the Petitioner's] raping them in order to retaliate against him for disciplining them." He asserts that trial counsel's failure to hire an expert to search for deleted photographs of D.C. would have shown that D.C. was lying when she claimed he took photographs of her, stored the photographs, and deleted the photographs.

As noted by the post-conviction court, the parties never disputed that D.C. was caught with boys in the home on the day the victims made the allegations against the Petitioner. Moreover, the Petitioner failed to present any surveillance video at the evidentiary hearing. Therefore, he has failed to demonstrate deficient performance or prejudice for trial counsel's not showing the video to the jury. Similarly, the Petitioner failed to show that his electronic devices contained exculpatory evidence, and he did not present an electronics expert at the evidentiary hearing. This court may not speculate as to the content of a witness's testimony. See Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). In addition, as noted by the State, trial counsel testified that while he believed the Petitioner's claim that the Petitioner did not sexually abuse the victims, he did not want to risk hiring an expert to find deleted photographs of D.C. Trial counsel's strategy was reasonable, and we will not second-guess his decision. Therefore, the Petitioner is not entitled to relief on this issue.

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgment of the post-conviction court.

_____
NORMA MCGEE OGLE, JUDGE